[Cite as *Tye-Smiley v. Ohio State Univ. Wexner Med. Ctr.*, 2019-Ohio-2956.]

| | |
|---|---|
| CHELLI TYE-SMILEY, Admr., etc. | Case No. 2016-00542JD |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER | |
| Defendant | |

{¶1} Plaintiff, individually and as the administrator of the estate of Eddie Smiley, brings this action for wrongful death and survivorship arising from Smiley's death on February 19, 2015. The case proceeded to trial before the undersigned magistrate.

**SUMMARY OF TESTIMONY**

{¶2} Cheryl Moore testified that at all times relevant she was employed as a nurse at Richland Correctional Institution, where Smiley was an inmate in the custody and control of the Department of Rehabilitation and Correction. Although Moore had no specific recollection of Smiley, she testified about medical records showing that she provided care to him in January 2015. Moore stated that progress notes and infirmary assessments that she made on January 27, 2015, show that she attended to Smiley while he was under observation in the infirmary with a complaint of pain in his right thigh which he rated as 5 on a scale of 1 to 10, and that while he said there had earlier been some intermittent pain radiating down to the right calf, when she saw him he had no calf pain. (Plaintiff's Exhibit 1, pp. 39, 155.) The medical records reflect that Smiley was using a walker to ambulate, Moore stated.

{¶3} Progress notes and infirmary assessments show that Moore next saw Smiley on the morning of January 29, 2015, when he was still under observation in the infirmary, she stated. (Id., pp. 41, 159.) As Moore documented, Smiley complained of pain in the right hip and thigh which he rated as an 8, and that after he stretched his

right leg earlier his calf felt tight. Moore stated that she would not have been present when, according to progress notes, Nurse Practitioner Christine Ungar saw Smiley later that morning and decided to have him transported by van to defendant's emergency department. (Id., p. 41.) But, Moore explained, after Unger wrote an order to have Smiley taken to the emergency department, she signed it to acknowledge reading it. (Id., p. 25.) Moore stated that her role would have then been to document Smiley's vital signs, which she recorded on an Emergency Assessment form that accompanies inmates when they go to outside facilities; the form also set forth Ungar's description of Smiley. (Id., p. 162.) Moore stated that Ungar or another advanced level provider would have been responsible for gathering any other documents to send with Smiley.

{¶4} Christine Ungar testified that at all times relevant she worked for the Department of Rehabilitation and Correction as a nurse practitioner at Richland Correctional Institution. Ungar stated that Smiley's medical chart shows that she saw him on January 5, 2015, for multiple complaints, including left knee pain that he attributed to having slipped and fallen on ice, and low back pain with radiculopathy that he attributed to ankylosing spondylitis, a chronic inflammatory disease that he had. (Id., p. 36.) The medical records appear to show that Ungar next saw Smiley on January 28, 2015, she stated. From Ungar's review of the records, Smiley had been in the infirmary for at least the preceding two days under the care of a physician who asked her to look after Smiley in his absence. Ungar noted that when she saw Smiley he was in discomfort and needed an assistive device to ambulate, whereas he had been able to walk under his own power when she saw him earlier that month. (Id., p. 40.) Ungar stated that she prescribed a one-time injection of Toradol for pain relief and saw no need to deviate from the plan of care put in place by the physician, who had ordered, among other things, an EMG to test the nerve function in the lower extremities, strengthening exercises for the back, and pain medication.

{¶5} Ungar testified that progress notes indicate she saw Smiley again the following morning, on January 29, 2015, at which time he complained of low back pain radiating down the right hip and into the thigh and calf. (Id., p. 41.) Smiley complained, she wrote, that his pain was worsening every day and that his leg felt heavy, and she observed that the right calf was slightly larger than the left and that the right lower extremity was tender to palpation. In her assessment, Ungar stated, she felt Smiley was at an increased risk of developing a deep vein thrombosis (DVT) due to his ankylosing spondylitis, the amount of time he was spending in bed, lab results showing an elevation of his erythrocyte sedimentation rate (ESR), and the inability of pain medication to relieve his symptoms. Ungar explained that she decided to send Smiley to defendant's emergency department to be evaluated, especially to evaluate whether his symptoms were being caused by a DVT versus radiculopathy. Ungar ordered a dose of the pain reliever tramadol and wrote an order to have Smiley transported out that included the term "R/O DVT." (Id., p. 25.) Ungar stated that in the Emergency Assessment form that would accompany Smiley she noted his medical history and complaints and her findings; she did not specify in the form that she wanted to rule out a DVT, nor did she note any calf symptoms, she explained, because she deferred to defendant to perform a workup and rule out all differential diagnoses. (Id., p. 162.) Ungar had no involvement in Smiley's care once he left the prison, she stated.

{¶6} Shabbir Matcheswalla, M.D. testified that he has been employed with defendant since 2011 as an Assistant Professor of Clinical Medicine, and is board-certified in internal medicine. Dr. Matcheswalla described his education, training, and professional background, and stated that he is Vice Chair of defendant's Clinical Operations Committee, which is charged with creating and making operational changes to increase efficiency and workflow and ultimately patient care.

{¶7} Dr. Matcheswalla, a hospitalist, explained that he admitted Smiley to the hospital early on the morning of January 30, 2015, after Smiley was seen in the

emergency department. An admitting hospitalist, Dr. Matcheswalla stated, performs an initial assessment of patients based on their history and a physical examination, and then manages their care and orders diagnostic testing where appropriate. For patients admitted from the emergency department, his initial assessment would generally include a review of the records from the emergency department. Developing a differential diagnosis is also part of the process, Dr. Matcheswalla explained, meaning that he identifies a framework of potential diagnoses based on the chief complaints of the patient—oftentimes before he sees the patient—to hone in on what questions to ask the patient and then try to rule out certain diagnoses through examination or testing. In Dr. Matcheswalla's explanation, identifying differential diagnoses is different than suspecting a diagnosis, as it is a broader consideration of potential diagnoses, but differential diagnoses may be indexed in order of high to low clinical suspicion.

{¶8} Although Dr. Matcheswalla did not recall Smiley, from his review of the medical records his chief differential diagnosis was that Smiley's symptoms were caused by ankylosing spondylitis. Dr. Matcheswalla acknowledged that ankylosing spondylitis was not a condition he saw often and this was one of the first patients in whom he suspected an exacerbation of the disease. Looking at the History & Physical notes he made, Dr. Matcheswalla explained that he felt elevated inflammatory markers, including ESR and CRP (C-reactive protein), in the bloodwork fit that explanation. (Defendant's Exhibit B, p. 13.) As Dr. Matcheswalla noted at the time, Smiley had already been seen for an orthopedic consultation in the emergency department which found there was low suspicion for a septic hip. The doctor who performed the consultation, though, noted that Smiley reported his symptoms were different than his usual flares of ankylosing spondylitis; Dr. Matcheswalla also noted Smiley reported normally having uveitis (eye inflammation) during flares but not this time, and that Smiley said it was abnormal for him to have leg pain during a flare. (Id., pp. 14, 17.) Dr. Matcheswalla stated that he prescribed prednisone to reduce inflammation and

requested a rheumatology consultation since this was a rare condition he was not very familiar with. Dr. Matcheswalla testified that he ordered an MRI of the lumbar spine to look for inflammation which would help solidify a diagnosis of an ankylosing spondylitis flare and he requested a physical therapy consultation to assess the patient's mobility, a common practice to determine the patient's disposition upon discharge from the hospital. And, Dr. Matcheswalla testified, he prescribed Ultram for pain relief and noted that Smiley would continue taking his regular doses of methotrexate and folic acid for managing the ankylosing spondylitis. Finally, Dr. Matcheswalla stated, he prescribed subcutaneous heparin as a DVT prophylaxis, as this was standard protocol for all patients admitted to the hospital.

{¶9} The concern with a DVT, Dr. Matcheswalla explained, is that it may travel from the deep vein where it originates, i.e. in the leg, and travel to the lungs, where it can lead to a fatal blood clot. Dr. Matcheswalla, who had no recollection of Smiley, stated that he typically reviews patients' charts before seeing them, and, from the information available to him in this instance, particularly the unilateral leg pain noted in the prison's Emergency Assessment form and the emergency department records, at least initially a DVT would have been somewhere among his differential diagnoses. Dr. Matcheswalla stated that upon examining Smiley, however, he concluded Smiley's complaints were probably resulting from ankylosing spondylitis and he did not suspect a DVT, making no reference to it in his written differential diagnosis or other notes. The most common signs of DVT in the calf are pain, swelling, and erythema (redness), Dr. Matcheswalla stated, and nowhere in his History & Physical notes did he identify such symptoms in the calf. (Id., p. 14.) Dr. Matcheswalla stated it is important that an admitting physician perform a thorough exam and record an accurate history, and if Smiley had calf pain he would have noted it. Dr. Matcheswalla also testified that Smiley did not have risk factors for a DVT, other than perhaps immobility. Dr. Matcheswalla acknowledged that patients can have multiple conditions at the same time and that

having an exacerbation of ankylosing spondylitis would not rule out a DVT, nor would a knee effusion, which Smiley also had.  Asked whether ankylosing spondylitis increases a patient's risk of a DVT, Dr. Matcheswalla did not know.  Dr. Matcheswalla was also asked about a DVT prevention policy or guideline of defendant's under which he stated that Smiley would have been in the moderate to high risk category, which would call for prophylactic medicine, which Smiley was getting, as well as ambulation.  (Plaintiff's Exhibit 14.)  Dr. Matcheswalla stated, though, that if he is concerned about DVT as a potential diagnosis, he would apply the Wells Criteria for assessing the risk, which sorts patients into either a low or high-risk category, and if a patient has a low likelihood under the Wells Criteria and low clinical suspicion, there is no need to test for a DVT.

{¶10} Allison Heacock, M.D. testified that she is board-certified in internal medicine and pediatrics and has held appointments with defendant since 2012 and with Nationwide Children's Hospital in Columbus since 2015.  Today, Dr. Heacock explained, she splits her professional time between serving as a hospitalist with defendant, seeing patients at Nationwide Children's Hospital, and teaching.  Dr. Heacock explained that during the relevant time period in 2015, which was prior to her joining the Nationwide Children's Hospital faculty, she spent 80 percent of her time in clinical work as a hospitalist, and 20 percent devoted to teaching and mentoring.  Dr. Heacock recounted her educational and training background and her professional history with defendant, including service on multiple hospital-wide committees.  Dr. Heacock acknowledged her medical license was suspended several years earlier and gave a forthright explanation that had no connection with patient care.

{¶11} Dr. Heacock testified that progress notes establish that after Dr. Matcheswalla admitted Smiley to the hospital early on the morning of January 30, 2015, she attended to him for the first time later that day.  (Plaintiff's Exhibit 2, p. 46.)  Dr. Heacock explained that Smiley was having chest pains and palpitations.  In a progress note, Dr. Heacock charted her plans for addressing four areas of concern, including

tachycardia (elevated heart rate), pleuritic chest pain, right knee enthesitis (inflammation), and ankylosing spondylitis. For example, Dr. Heacock took steps to rule out heart problems, and inasmuch as Smiley indicated that he thought a dose of prednisone he was given during the orthopedic consultation was causing some of his symptoms, she lowered his dosage. Dr. Heacock related that she recommended anti-inflammatories to address the ankylosing spondylitis, and, she also explained, pleuritic chest pain is a relatively benign inflammation of the lungs commonly associated with ankylosing spondylitis.

{¶12} Dr. Heacock explained that the swelling she observed at that time was limited to the knee, being inside the joint and on top of the kneecap, giving the knee a large, puffy appearance. As Dr. Heacock noted, the orthopedic consultant had already examined the knee and her plan was to order a rheumatology consultation and steroid injection, and if the pain persisted she would order an MRI. Whereas Dr. Heacock documented symptoms in the right knee, she related that there is nothing in her progress notes from that initial examination, nor during her subsequent encounters with Smiley over the course of her time serving as his attending physician, reflecting swelling, tenderness, or redness in the calf, which she stated are signs of DVT. Dr. Heacock testified that, based upon her notes, she does not believe that she viewed DVT as a differential diagnosis; otherwise, she would have documented it as such and ordered testing to rule it out. Dr. Heacock's only reference in her progress notes to DVT was to document that Smiley was receiving heparin as a DVT prophylaxis.

{¶13} Dr. Heacock recounted that the next day, January 31, 2015, a nurse called her to express concern about Smiley's chest pain, so she saw him again and made a progress note. (Plaintiff's Exhibit 2, p. 37.) According to Dr. Heacock, Smiley looked anxious and had an elevated heart rate, and she explained how, based upon examining him and evaluating his heart rhythm, she wanted to rule out acute coronary syndrome, a pulmonary embolism, or pleuritis. Dr. Heacock testified that she ordered a check of

Smiley's troponin level, which is a marker used to identify someone at risk of having a heart attack, she ordered a chest x-ray, and she ordered a D-dimer test. The D-dimer test, Dr. Heacock explained, is a blood test that she ordered to rule out a pulmonary embolism. When the lab results came back, Dr. Heacock stated, the troponin levels were normal, suggesting that Smiley did not have acute coronary syndrome. Dr. Heacock related that the D-dimer level was elevated, however, so she ordered another test that definitively ruled out a pulmonary embolism.

{¶14} Dr. Heacock explained that as Smiley continued to have chest pain, tachycardia, and significant anxiety symptoms, it was difficult to tell whether the symptoms were from pleuritis or were secondary to steroidal medication. Dr. Heacock noted on February 3, 2015, that she was called to see him due to reports of him having chest pain, tachycardia, and anxiety, as well as biting his arm and yelling "get them off of me, get them off." (Defendant's Exhibit B, p. 55.) Dr. Heacock stated that she arranged a psychiatric consultation, which, as she wrote in her progress notes on February 3, 2015, determined that Smiley seemed to be having a reaction to steroidal medication. (Plaintiff's Exhibit 2, p. 49.) Regarding Smiley's right knee pain, Dr. Heacock testified that due to its persistence she eventually ordered an MRI that showed a large effusion, which was significant in her view since a large amount of fluid had already been removed from the knee a few days earlier, and a ruptured Baker's cyst was found as well. (Defendant's Exhibit B, p. 105.) After having obtained what she considered to be good explanations for Smiley's symptoms, Dr. Heacock explained that on the evening of February 3, 2015, she sent an email to colleagues who would be coming on shift and replacing her wherein she identified Smiley as among several patients whom she felt could potentially be discharged the next day.

{¶15} Dr. Heacock testified that she does not feel that she failed to diagnose a DVT because Smiley did not have the clinical symptoms of a DVT and, between the ankylosing spondylitis, the related knee issues, and consultations and testing, the

symptoms that he did have were explained. Dr. Heacock acknowledged that impaired mobility is a risk factor for DVT, but she understood from Smiley that he could ambulate with a walker, and, as she described this risk factor, it is more associated with someone who is bedridden rather than ambulatory with an assistive device. Dr. Heacock acknowledged that ankylosing spondylitis is a risk factor for developing a DVT, but she distinguished having a risk factor versus having clinical symptoms.

{¶16} Clinical symptoms of a DVT can include unilateral swelling and pain in the lower leg, starting in the calf, and tenderness to palpation of the calf, Dr. Heacock stated, but she did not find the calf to be swollen or tender. Dr. Heacock related, for instance, that on February 1, 2015, she specifically noted there was "No LEE," meaning no lower extremity edema. (Plaintiff's Exhibit 2, p. 53.) In terms of where Smiley did have swelling during his hospitalization, Dr. Heacock stated that she thought it was essentially associated with the effusion of the right knee. Dr. Heacock acknowledged that nursing notes documented some consistent swelling in the right "leg," but she stated that the software the nurses use to make their notes does not give them the ability to pinpoint where the leg is swollen, such as distinguishing between the upper and lower portions of the leg. Dr. Heacock was also asked about nursing notes documenting tenderness in the knee, ankle, and foot, and she testified that since ankylosing spondylitis typically affects joints, whereas a DVT does not, ankylosing spondylitis was consistent with those symptoms and it would not be reasonable to assume from such notes that Smiley had tenderness in the calf.

{¶17} Regarding the test of the D-dimer level when she wanted to rule out a pulmonary embolism as a possible cause of the chest symptoms, Dr. Heacock acknowledged that an elevated D-dimer level can be consistent with a DVT, and she was questioned about whether further tests should have been ordered to determine why the D-dimer level was elevated. But, Dr. Heacock testified that the D-dimer level is not at all specific to blood clots, as it may be elevated for various reasons, and, in this case,

the rheumatological inflammation that Smiley had in connection with ankylosing spondylitis provided an explanation.  Indeed, Dr. Heacock stated, Smiley's lab work revealed two other elevated inflammatory markers that were consistent with that explanation.  Dr. Heacock stated that since she had no clinical suspicion of a DVT with this patient, and with there being an explanation for the elevated D-dimer level, there was no need to order testing to rule out a DVT—an ultrasound being the definitive test.  Dr. Heacock was asked several questions about applying the Wells Criteria, which she acknowledged calls for a D-dimer test when performing a workup on a patient who is found to have only a low risk of DVT, but her testimony was that the Wells Criteria is not indicated when there is no clinical suspicion of DVT.  Dr. Heacock stated that only if she had clinical suspicion of DVT would she have applied the Wells Criteria and ordered an ultrasound once the D-dimer level was found to be elevated.  Simply put, according to Dr. Heacock, a patient's clinical symptoms are used to determine whether DVT should be in the differential diagnosis, and if it is, that is when testing should be done to rule it out.

{¶18} Alexa Meara, M.D. testified that she is board-certified in internal medicine and rheumatology and is an Assistant Professor in defendant's Department of Internal Medicine, where she sees patients, teaches, and performs research.  During the timeframe at issue, Dr. Meara testified, she was a rheumatology fellow and saw patients in an outpatient clinic and performed consultations in the hospital.  Looking at the medical records, Dr. Meara explained that when Dr. Matcheswalla admitted Smiley to the hospital on January 30, 2015, he ordered a rheumatology consultation.  (Plaintiff's Exhibit 2, p. 91.)  Dr. Meara testified that she documented performing the consultation later that day.  (Defendant's Exhibit B, p. 21.)  During the consultation, Dr. Meara stated, she would have given Smiley a full physical examination, and beforehand she likely read Dr. Matcheswalla's History and Physical report.  Dr. Meara stated that she understood Smiley had a history of ankylosing spondylitis and came to the hospital with

worsening back and leg pain.  Dr. Meara explained that the rheumatology consultation was ordered essentially to determine if Smiley's symptoms were being caused by his ankylosing spondylitis.

{¶19} As a consultant, Dr. Meara stated, her role is to perform a physical examination and make recommendations.  Dr. Meara explained the findings she recorded upon examining Smiley, including a right knee effusion, meaning fluid on the knee, as well as inflammation in the knee, and that her plan was to give the knee a steroid injection and if there was no improvement in 48 hours she would recommend an MRI.  From what Dr. Meara found, it appeared that Smiley was having a flare-up of ankylosing spondylitis, albeit different than his typical presentation.  Pertaining to ankylosing spondylitis, Dr. Meara at the time recommended some additional medication to help with inflammation as well as physical therapy.  (Defendant's Exhibit B, p. 24.) Insofar as her note indicates she called plaintiff at Smiley's request, Dr. Meara stated that it is her custom to contact patients' families.

{¶20} The next time she saw Smiley was February 2, 2015, Dr. Meara stated. Beforehand, she would have reviewed anything in the chart that happened since she last saw him, Dr. Meara explained.  Dr. Meara was asked specifically about the elevated D-dimer results from the testing ordered by Dr. Heacock, but she explained that in her field all patients have elevated inflammatory markers, so it is difficult to assign any meaning to an elevated D-dimer level and it is not a test she uses.  Dr. Meara testified that asymmetrical swelling and pain are the primary signs she looks for in terms of a potential DVT, and if she were concerned, she would order an ultrasound as a diagnostic test.  Dr. Meara noted during this second visit that Smiley reported the steroid injection provided some relief for the knee pain, but the pain persisted and Smiley did not want another injection because of the side effects.  (Defendant's Exhibit B, p. 24.)  Dr. Meara explained the findings that she recorded and she testified that she recommended an MRI of the right knee to rule out a fracture.  An MRI was

performed on the right knee later that day, she testified, and showed a large effusion and inflammation of the joint lining, as well as a Baker's cyst and a popliteal cyst. (Plaintiff's Exhibit 2, p. 40.)  Dr. Meara related how the MRI explained Smiley's pain symptoms, consistent with ankylosing spondylitis.  Dr. Meara described the plan she recommended at that time for managing the ankylosing spondylitis with medication on an outpatient basis going forward, and leaving the care of the knee and chest pain to other specialists or primary care providers.  From a rheumatology standpoint, it was appropriate at that time to discharge Smiley, Dr. Meara stated.

{¶21} Robert K. Mathew, D.O. testified by way of deposition.[1]  (Joint Exhibit 1.) Dr. Mathew related that he is board-certified in internal medicine and practices as a hospitalist at Dartmouth-Hitchcock Medical Center in New Hampshire, where he is an Assistant Professor of Medicine and the On-Call Medical Director.  Dr. Mathew testified that he became involved with Smiley's care when he came on shift on February 4, 2015, taking over for Dr. Heacock.  Dr. Mathew explained that toward the end of her shift Dr. Heacock sent an email to him and other hospitalists to communicate about their patients, which was a standard practice.  When Smiley's care was transitioned to him, Dr. Mathew stated, he would have had the information Dr. Heacock provided and he would typically review information in the patient's chart, such as the history, trends in bloodwork and vital signs, and diagnostic interventions, and in the case of prisoners, the transfer document from the prison.  Dr. Mathew understood that Dr. Heacock felt Smiley's knee symptoms were being caused by an exacerbation of ankylosing spondylitis, that the knee had been tapped to rule out an infection and studied with an MRI that further explained the knee problems, and he was having chest pain and anxiety attacks likely related to steroid medication, and, if he did well after some

_____

[1]The objections on pages 12; 13; 14; 15; 16; 17; 20; 30; 32, lines 2 & 6; 33, line 14; 41; and, 43 are OVERRULED.  The objections on pages 32, line 14; and, 33, line 6 are SUSTAINED.

adjustments to his medication, Dr. Heacock felt he could be discharged and get outpatient follow-up care for orthopedics, rheumatology, and physical therapy.

{¶22} Dr. Mathew acknowledged that on some level he deferred to Dr. Heacock, and he explained how hospitalists also rely on the input of consultants in managing patient care, but he explained how he would have evaluated Smiley's condition, particularly over the last 24 hours when he came on shift, and made sure that orders for any testing or consultations were carried out and were not contrary to discharging Smiley. Dr. Mathew explained that he examined Smiley before making the decision to discharge him, and that by this point Smiley's knee effusion was tender but the knee had better range of motion than previously described, and Smiley's pain was better managed and his ambulation was slowly improving such that he was able to move with assistance. Dr. Mathew explained that he then decided to discharge Smiley and he described the plan of care upon discharge, and, he stated, nothing in the discharge notes would raise any concern for DVT. Dr. Mathew testified that had he seen signs of DVT, he would have ordered an ultrasound since it was already known that the D-dimer level was elevated. Dr. Mathew explained that whereas a D-dimer test is one way to test for a DVT, an elevated D-dimer level can result from other things than just a blood clot, so a positive test must be taken in context with the patient. Pain and swelling in a lower extremity is chiefly what Dr. Mathew looks for in terms of concern for a DVT, he stated. Immobility, trauma, malignancy, and inflammatory states are among the risk factors for DVT, according to Dr. Mathew, so in this instance the inflammatory state associated with ankylosing spondylitis was a risk factor, he stated. In Dr. Mathew's view, though, immobility was no more of a risk factor than with hospitalized patients in general.

{¶23} Tamara Salyer testified that she has been a registered nurse for 21 years and at all times relevant was employed at Franklin Medical Center, which is operated by the Department of Rehabilitation and Correction. Salyer testified that medical records

show when Smiley was discharged from the hospital on February 4, 2015, the Department of Rehabilitation and Correction transported him to Franklin Medical Center and she admitted him into the facility. During that process, Salyer stated, she would have reviewed parts of the hospital chart to familiarize herself with what transpired there. Salyer testified that warmth, tenderness, swelling, and redness are symptoms of a DVT, and if she had suspicion about a patient having a DVT she would notify an advanced level provider, meaning a doctor or nurse practitioner. In this case, Salyer recounted, she only knows what is set forth in the medical records, which show that she did not note any such suspicion or notify an advanced level provider either at the time of admission, or when she saw Smiley again on February 7, 2015. Salyer agreed that even though she was confident to rely on the professionals at the hospital to detect a DVT, it did not relieve her of the duty to examine the patient.

{¶24} Teddi Anderson testified that she has been a registered nurse since 1989 and at all times relevant was employed at Franklin Medical Center. Anderson testified that defendant's hospital commonly prepared a discharge summary when it discharged an inmate-patient, which in this case Dr. Mathew prepared. (Plaintiff's Exhibit 3, p. 162.) While she would rely on the expertise of the professionals at the hospital in reviewing a patient's complaints, she explained, it did not relieve her from her duties in assessing the patient. Anderson testified that she understands the clinical signs of DVT to be cramping, redness, pain, and swelling, in the legs or arms, and that signs of a pulmonary embolism include shortness of breath, decreased saturation levels, pain in inspiration and expiration in the chest, as well as back pain. If she suspected either condition, Anderson stated, she would contact an advanced level provider, but there is no documentation that she had any such suspicions. Anderson testified, though, that records indicate she cared for Smiley on February 9, 2015, at which time he complained of chest pain, and, after reviewing his EKG and finding him to have sinus tachycardia, she notified a nurse practitioner.

{¶25} Katie Coleman testified that at all times relevant she worked as a licensed physical therapist at Franklin Medical Center, providing physical therapy treatment and evaluation to inmates.  Coleman testified that records show she evaluated Smiley on February 9, 2015, and made an overall report on his physical status to determine what his abilities were and what deficits could be improved with physical therapy.  Coleman also testified that she filled out a daily living assessment form in which she noted that Smiley was dependent on a wheelchair for mobility and needed other modifications with certain aspects of his daily living, but so long as he had such modifications he did not need assistance to take care of himself.  Coleman stated that even though diagnosing a DVT is outside the scope of her practice, she is trained on identifying signs of DVT and notifies a doctor or nurse if there is a concern, but the documentation of her interaction with Smiley does not show that she had any such concern about him.

{¶26} Portions of the deposition testimony of Konstantinos D. Boudoulas, M.D. were admitted into evidence as Defendant's Exhibit 37.[2]  Dr. Boudoulas testified that he has been employed with defendant since 2009 and presently serves as Section Head of Interventional Cardiology and Director of the Cardiac Cath Laboratory for the Division of Cardiovascular Medicine.  Dr. Boudoulas stated that he became involved in caring for Smiley after Smiley was transported back to the emergency department on February 10, 2015, after suffering a bilateral pulmonary embolus at Franklin Medical Center.  Dr. Boudoulas testified that following Smiley's death at the hospital nine days later, on February 19, 2015, he signed the death certificate and wrote therein that the cause of death was a pulmonary embolism, and in the field pertaining to the "Approximate Interval Between Onset and Death" he wrote "Unknown."  (Plaintiff's Exhibit 6.)  Asked whether pulmonary embolisms are often a result of a DVT, Dr. Boudoulas said no.  Also, when asked if a DVT typically predates a pulmonary

---

[2]The portions admitted were page 9, line 2, to page 10, line 3; page 11, line 21, to page 12, line 2; page 30, line 20, to page 31, line 9; page 36, lines 6 to 9; and, page 37, lines 9 to 19.

embolism, Dr. Boudoulas stated that it depends on the case, and he further testified that he cannot say whether Smiley had a DVT before the pulmonary embolism.

{¶27} Plaintiff, Chelli Tye, testified that she and Smiley knew each other since junior high school and had some contact over the years, but did not become romantically involved until 2013. Plaintiff stated that Smiley lived a lifestyle she did not approve of earlier in his life, but by the time they became involved he had changed and they quickly developed a strong connection. Plaintiff related that she was 42 years old at the time and neither she nor Smiley, then 43, had been married. Smiley had four children and she had one of her own, plaintiff stated, and she talked about how much affection he had for his children and how he raised his daughter as a single parent. Plaintiff testified that in approximately October 2013, within about 30 days after they got involved, Smiley moved in with her and told her he wanted to marry her. Plaintiff, who spoke of her difficult battle with breast cancer since being diagnosed in 2013, stated that Smiley bought them matching pink breast cancer awareness rings and that they began calling each other husband and wife, and soon thereafter they bought wedding bands.

{¶28} Plaintiff testified about several photographs of her and Smiley from the time they lived together, which ended in January 2014 when he was sentenced to a three-year prison term, apparently for breaking into a house and taking some property. Plaintiff stated that she spoke to Smiley over the telephone almost daily while he was in prison and that she visited as much as she could despite her cancer treatments and surgeries, and, on May 10, 2014, they were married at the prison. (Plaintiff stated that although she is identified in the complaint as Chelli Tye-Smiley, she never legally changed her maiden name.) Plaintiff offered into evidence several emails, letters, and cards that they exchanged, some of which were artwork that Smiley made. Smiley took GED courses and participated in self-improvement programs while in prison, plaintiff stated.

{¶29} Plaintiff testified that Smiley had chronic health issues, including ankylosing spondylitis, and she accompanied him to medical appointments before he went to prison. Plaintiff also recounted keeping apprised of Smiley's medical issues after he went to prison and she recalled speaking with him by telephone while he was in the hospital. Plaintiff stated that she got a telephone call from Dr. Heacock on Smiley's first full day in the hospital, letting her know that he was there and what his status was. According to plaintiff, Dr. Heacock said Smiley's primary complaint was leg pain, and she was developing a plan of care for him. Plaintiff recalled a female rheumatologist calling her as well and discussing a plan of care pertaining to ankylosing spondylitis. Plaintiff testified that there were some limitations on how often she could speak to Smiley but that she would contact Richland Correctional Institution and Franklin Medical Center, after he was transferred there, and piece together information as best she could.

{¶30} After receiving a call from someone at Franklin Medical Center on February 10, 2015, notifying her that Smiley had been found unresponsive and sent to defendant's emergency department, plaintiff stated, she went to see him and she remained at the hospital until his passing. Plaintiff described the medical attention given to Smiley during those days and her experience being by his side, including how she initially had some hope that he might persevere and he had moments where he seemed aware of his surroundings, but that ultimately his condition declined and she had to make the difficult decision under the advice of his care providers to withdraw life support.

{¶31} Plaintiff explained in some detail how Smiley's family dynamics were complicated at the time and no family members were contacted until he passed away, when she called his daughter. Along the same lines, plaintiff stated, complications between her and Smiley's family resulted in her not attending a memorial service that they held, but for some time she did maintain a relationship with Smiley's daughter,

whom she described as being devastated. Plaintiff scattered Smiley's ashes in a place that was special to them, she stated. Plaintiff told how, in the aftermath of losing her husband and amid her battle with cancer, she had trouble functioning and her life was shattered. In that context, plaintiff explained, she made what in hindsight what was a regrettable decision to get remarried in December 2015 to the father of her adult son, who had known her for nearly 30 years and wanted to help in her time of need, but that it was not fair to him given the shape she was in emotionally, so after a few months they separated and the marriage was later annulled. Plaintiff talked about how things have slowly improved for her since then and how she is trying to move forward, in spite of her continued serious health problems.

{¶32} RaShawn Long testified that he and his twin brother DaShawn are Smiley's sons, and that they have a sister, Takeia Smiley, and another brother, Eddie Taylor. Although he lived primarily with his mother while growing up, Long stated that he saw his father with some regularity, especially at family gatherings on holidays and birthdays. Long spoke about going to church and doing other activities together, and how his father made sure he and his twin brother were taken care of when they were kids, like ensuring they had money for haircuts and groceries. Long stated that he was about 16 years old when his sister, who lived primarily with their father growing up, called with the unexpected news of his passing. Long stated that he was often away from home and busy with friends around that time and did not know of his father's incarceration. Long also stated that he had never met plaintiff and did not know she and his father were seriously involved. There was a memorial service for his father at the family church, which plaintiff did not attend, Long said. Long, who stated that he is studying science, technology, engineering, and mathematics at Cuyahoga Community College, described what the loss of his father has meant to him, such as not having him around to see him grow up and graduate from high school or serve as a male figure in

his life, and he stated that he avoids talking about what happened because it is too hard.

{¶33} David H. Goldstein, M.D., an expert witness for plaintiff, testified by way of deposition.[3]  (Plaintiff's Exhibit 35.)  Dr. Goldstein is a hospitalist at Sarasota Memorial Hospital in Florida and is board-certified in pulmonary and internal medicine, he stated.  Dr. Goldstein, who received his medical degree in 1976, described his education and training and stated he does some teaching through Florida State University but is primarily a clinical practitioner.  Dr. Goldstein summarized the role of hospitalists, essentially that they admit patients to the hospital, make rounds with admitted patients, and discharge patients.  When a patient is admitted through the emergency room, Dr. Goldstein related, the hospitalist generally obtains the patient's history and complaints, examines the patient and reviews any available test results, and then develops a differential diagnosis and takes steps to try and rule out potential diagnoses.

{¶34} Dr. Goldstein explained what a DVT is and the problems it can cause, ranging from pain and discomfort on the low end to sudden death from a pulmonary embolism on the high end.  Dr. Goldstein testified that when his patients are admitted to the hospital they are assessed for DVT risk and a determination is made as to any preventive measures that should be ordered, such as the administration of blood-thinning medication as a prophylaxis or compression stockings.  And, Dr. Goldstein stated, DVT is a commonly considered differential diagnosis, and in such cases steps should be taken to then rule it out, even if the degree of suspicion is low, because of the potentially catastrophic consequences.  The classic presentation of a DVT is a patient with a history of some risk factors, plus swelling, pain, and erythema in one extremity, Dr. Goldstein testified, and those symptoms are usually located in the calf.  To rule out a DVT, a physician can order an ultrasound of the suspicious area, Dr. Goldstein testified.

---

[3]The objections raised in the deposition are OVERRULED.

{¶35} Dr. Goldstein discussed the history of Smiley's care and treatment beginning at Richland Correctional Institution, and he had no criticism of the caregivers there nor was he critical of the doctors who saw Smiley in the emergency department. Dr. Goldstein next discussed Smiley's admission to the hospital by Dr. Matcheswalla. In Dr. Goldstein's opinion, Dr. Matcheswalla appropriately ordered heparin as a DVT prophylaxis. But, it was noted by Dr. Goldstein that Dr. Matcheswalla stated he considered DVT as a differential diagnosis even though he did not document it as such, and Dr. Goldstein's opinion is that the standard of care then required Dr. Matcheswalla to try to rule out a DVT by ordering an ultrasound of the right leg. Dr. Goldstein admitted, though, that Dr. Matcheswalla never said he suspected a DVT, only that he considered it as a differential diagnosis. Dr. Goldstein also described the Wells Criteria for the clinical probability of a DVT, which he said is a scoring system to aid physicians in assessing patients for DVT risk, and in his view Dr. Matcheswalla basically applied the criteria when identifying DVT as a differential diagnosis. (Plaintiff's Exhibit 16.) On cross-examination, Dr. Goldstein acknowledged that the Wells score for Smiley would have fallen under the category of "unlikely and low probability."

{¶36} Regardless of the consideration Dr. Matcheswalla gave DVT as a differential diagnosis, Dr. Goldstein's opinion was that the Emergency Assessment form that accompanied Smiley to the hospital by itself should have prompted Dr. Matcheswalla to treat DVT as a differential diagnosis insofar as the history of right leg swelling and pain would be consistent with a DVT. (Plaintiff's Exhibit 1, p. 162.) Dr. Goldstein admitted, though, that the Emergency Assessment form did not note any calf symptoms and he admitted that a doctor in the emergency department who had just seen Smiley did not note any swelling in the right leg, although he pointed out that a nurse noted swelling in the leg at 1:38 a.m. (Plaintiff's Exhibit 2, p. 166.) Regardless, in Dr. Goldstein's view, given the history in the Emergency Assessment form, together with immobility being a risk factor for DVT, a reasonable physician should have ordered

testing to rule out a DVT. Dr. Goldstein explained that a D-dimer test is a standard test for doing that, but that in this case it probably would not have been helpful since Smiley's inflammatory condition would have elevated his D-dimer level, so an ultrasound of the right leg would have been the appropriate test.

{¶37} Dr. Goldstein, citing the history of pain and swelling in one leg, also felt that after Smiley's care transitioned to Dr. Heacock, the standard of care required her to consider DVT as a differential diagnosis and order an ultrasound to rule it out, just as he opined Dr. Matcheswalla should have done at the time of admission. An ultrasound was especially required, Dr. Goldstein stated, once the D-dimer level was found to be elevated. Regarding the D-dimer test, Dr. Goldstein felt that Dr. Heacock appropriately ordered it in response to the complaints of chest pain and that once the D-dimer level was found to be elevated she appropriately ordered a CT scan to rule out a pulmonary embolism. It was also acknowledged by Dr. Goldstein that the elevated D-dimer level could have been caused by an exacerbation of ankylosing spondylitis or the knee effusion, as an elevated D-dimer level is consistent with any inflammatory response. Nevertheless, according to Dr. Goldstein, the history of swelling and pain in one leg, which was shown in the medical records to have increased for a time during the hospital stay, combined with the elevated D-dimer level required an ultrasound of the right leg.

{¶38} With respect to Dr. Mathew, Dr. Goldstein explained that a discharging physician has a duty to review the patient's chart and make sure everything that was ordered was done, for example, checking to see that all test results have come in, and generally making sure nothing was missed. According to Dr. Goldstein, Dr. Mathew should have seen from the chart that Smiley was admitted to the hospital with unilateral leg pain, had risk factors for a DVT, and did not get ruled out for a DVT, so in his opinion the standard of care required Dr. Mathew to order an ultrasound. Dr. Goldstein acknowledged that nursing notes show the swelling in the knee and leg had decreased by February 4, 2015, when Dr. Mathew attended to Smiley and made the decision to

discharge him, but Dr. Goldstein stated that swelling may have gone down from lying in bed, steroids and anti-inflammatories and otherwise treating the knee effusion.

{¶39} Thus, Dr. Goldstein's opinion is that Drs. Matcheswalla, Heacock, and Mathew each violated the standard of care in not ordering an ultrasound of the right leg. Had they done so at any time during the first hospitalization, Dr. Goldstein opined, a DVT more likely than not would have been detected in the calf and prompted the administration of antithrombotic or anticoagulation drugs. According to Dr. Goldstein, the efficacy of such medication depends on the timing of when it is administered relative to when a blood clot travels thorough the veins, such that it is significantly effective if administered as little as 24 hours before a clot travels, and it is almost entirely effective when administered at least 4 to 5 days before a clot travels. In Dr. Goldstein's opinion, if the medication were started at any time during the first hospitalization, Smiley would not have suffered the pulmonary embolism that caused his death. So, the hospitalists' failure to order an ultrasound was the reason Smiley died, according to Dr. Goldstein.

{¶40} Given that calf symptoms were noted in prison medical records (which did not accompany Smiley to the hospital), Dr. Goldstein stated that in his opinion Smiley probably developed a DVT a few days before his admission to defendant's hospital. Indeed, Dr. Goldstein opined that the clots which ultimately caused Smiley's death were from a DVT that was present at the time of his admission. Dr. Goldstein admitted, though, that from the time Smiley arrived at the hospital he was experiencing an exacerbation of his ankylosing spondylitis which probably manifested in several ways that were not consistent with a DVT, including tenderness to palpation of the lumbar spine and sacroiliac joints, tenderness to palpation of the right lateral hip, and the right knee effusion that was confirmed through both x-ray and MRI imaging. Dr. Goldstein also admitted that during the hospitalization Smiley had both a ruptured Baker's cyst and a partially ruptured popliteal cyst, as shown through the MRI.

{¶41} Still, Dr. Goldstein testified that there are many risk factors for a DVT, a few of which are age (over 60), recent surgery, trauma, malignancy, decreased mobility, and rheumatological conditions, and that the latter two were present in Smiley's case. Dr. Goldstein stated that Smiley's ability to ambulate was limited enough that this was a risk factor, as was his ankylosing spondylitis. Dr. Goldstein described ankylosing spondylitis as a rheumatological condition related to autoimmune disease, mostly affecting males, which can cause inflammation and pain primarily in the spine, eyes, and larger joints, including the knee, although the symptoms are most commonly in the back or hip. Dr. Goldstein testified that ankylosing spondylitis does not commonly cause unilateral swelling in one leg, whereas a patient with a DVT may have swelling through the whole leg, and he testified that a competing diagnosis does not rule out having two conditions at once, especially when the competing diagnosis is a risk factor for DVT; in fact, he opined that ankylosing spondylitis and the related effusion probably "was the reason why the patient developed the DVT." As Dr. Goldstein acknowledged, though, usually the swelling and pain associated with a DVT is localized in the calf, and although he contends that references in the medical records to symptoms in the right leg in general must include the calf, there were no specific references to calf symptoms in the hospital records or the prison's Emergency Assessment form, nor was Smiley ever documented to have erythema, another classic DVT symptom. Dr. Goldstein also admitted that over fifty percent of patients diagnosed with a pulmonary embolism caused by a DVT had no prior signs or symptoms of a DVT.

{¶42} Regarding the events following Smiley's discharge from the hospital, in Dr. Goldstein's view the symptoms remained about the same while he was at Franklin Medical Center, at least until February 9, 2015, when he complained of chest pain. Dr. Goldstein observed that since chest pain had been evaluated earlier at the hospital and resulted in a negative finding for a pulmonary embolism, it was reasonable under the circumstances that Smiley remain at Franklin Medical Center, although if he had not

already been seen at the hospital the standard of care would have required that he be sent there for evaluation, in Dr. Goldstein's opinion. Dr. Goldstein admitted that during his deposition he was critical of the care provided at Franklin Medical Center, but he testified that he changed his mind based on his understanding that the personnel at Franklin Medical Center familiarized themselves with the medical chart from the hospital to know the workup that had been done there, so that even though the standard of care required that the symptoms be evaluated, it would have been reasonable in this particular case to rely on what had been done at the hospital. Dr. Goldstein explained how, after Smiley was found unresponsive the next day after suffering a pulmonary embolism and was transported back to the hospital, studies revealed numerous blood clots in the lung and some in the leg, which meant the process must have started in the leg. (Plaintiff's Exhibit 5, p. 35.) After the pulmonary embolism, Smiley's prognosis was extremely poor, Dr. Goldstein testified, and he had no criticism of the care provided during the second hospitalization.

{¶43} Brian R. Zeno, M.D., an expert witness for defendant, testified that he is board-certified in pulmonary and critical care medicine and primarily practices at Riverside Methodist Hospital in Columbus, where he also has some teaching responsibilities. Dr. Zeno, who received his medical degree in 2000, described his educational and training background and explained that about 60% of his practice is devoted to critical care medicine, in which capacity he sees patients in the intensive care unit for many different issues, and otherwise he practices as a pulmonologist, usually as a consultant. Dr. Zeno stated that while his practice is specialized, he has the same training as hospitalists and there is a great deal of overlap between his work and the hospitalists with whom he practices, and in the intensive care unit it is common to evaluate a patient suspected of having a DVT, something he does a hundred or more times a year.

{¶44} Looking at Dr. Matcheswalla's notes from the time of the hospital admission, Dr. Zeno explained how the complaints of back and right leg pain were consistent with ankylosing spondylitis, which he described as an autoimmune disease primarily affecting the spine and sacroiliac joint, as well as other joints, that can have manifestations beyond the joints, such as in the eyes or bowel. He stated that patients with the disease are prone to flares for no definitively-known reasons, and a flare in the low back may result in pain down to the hip, buttock, thigh, knee, and Achilles tendon.

{¶45} Dr. Zeno testified that he would expect Dr. Matcheswalla would have reviewed the Emergency Assessment form that accompanied Smiley from Richland Correctional Institution, which he said identifies symptoms of ankylosing spondylitis, i.e. progressive low back pain with radiculopathy and associated leg pain and swelling. Imaging studies done in the emergency department showing the right knee effusion (which he described as inflammation of the synovial space in the knee) were more evidence of ankylosing spondylitis, Dr. Zeno stated, as was the opinion of the orthopedist who saw Smiley before his hospital admission, and Smiley's mobility problems were also consistent with the disease. Dr. Zeno stated that the mere mention of swelling and pain in one leg in the Emergency Assessment form, by itself, would cause a reasonable physician to physically examine the patient, but that the degree of any suspicion for a DVT would depend on where the swelling and pain were located within the leg. Dr. Zeno explained how Dr. Matcheswalla's examination found that the swelling was in the upper portion of the leg, which would not be concerning for a DVT of the popliteal vein, the symptoms of which he identified as pain, swelling, and erythema in the calf, ankle or foot, and he detailed how swelling should be at or below—not above—a clot.

{¶46} Dr. Zeno also explained how nothing in Dr. Matcheswalla's impression/plan portion of the History and Physical report is concerning for a DVT. Dr. Zeno went on to opine that, because Smiley's symptoms were all consistent with ankylosing spondylitis,

he does not believe Smiley had a DVT at the time of admission.  In Dr. Zeno's opinion, the differential diagnosis that Dr. Matcheswalla wrote out in the History and Physical report was thorough and correctly associated the symptoms with ankylosing spondylitis, and the treatment provided by Dr. Matcheswalla met the standard of care.  On cross-examination, Dr. Zeno acknowledged that in forming his opinion he relied in part on the physical exam findings that Dr. Matcheswalla documented, and he admitted that insofar as Dr. Matcheswalla noted under the musculoskeletal exam portion of the document that there were "No joint effusions," this finding runs counter to everything else known about Smiley's condition.  (Plaintiff's Exhibit 2, p. 23.)

{¶47} Dr. Zeno observed that when Dr. Heacock became involved in Smiley's care and came to see him in response to complaints of chest pain, palpitations, and dizziness, she found that Smiley had T-wave inversions, which can be indicative of heart strain, and she documented having concern for acute coronary syndrome, pulmonary embolism, or pleuritis (inflammation of the lining of the lung which causes pain when breathing deeply or coughing).  (Defendant's Exhibit B, p. 37.)  As a result, Dr. Zeno stated, Dr. Heacock ordered that Smiley's troponin and D-dimer levels be tested.  Checking troponin levels tests the patient's risk of myocardial infarction, Dr. Zeno stated, and checking the D-dimer levels indicates whether there is a breakdown of clotting components in the blood.  Dr. Zeno stated that the troponin test was negative for myocardial infarction, but that the D-dimer level was elevated and that Dr. Heacock then appropriately went ahead and ordered a CT to rule out a pulmonary embolism. Dr. Zeno acknowledged that a DVT can cause a patient's D-dimer level to be elevated, but he insisted that the elevation can result from any number of reasons, including inflammation, such that in a patient like Smiley with an active inflammatory disease, the D-dimer test has little utility.  Dr. Zeno pointed out that other inflammatory markers were also elevated, all consistent with inflammation caused by ankylosing spondylitis.

{¶48} Dr. Zeno explained that since Dr. Heacock ordered the D-dimer test in the context of Smiley's chest pain and concern for a pulmonary embolism, once the positive result came back the reasonable next step was to order the CT, which then definitively ruled out a pulmonary embolism. This was the appropriate workup for a patient with Smiley's symptoms, Dr. Zeno testified. The appropriate workup if there had been reason to suspect a DVT in this case, Dr. Zeno stated, would have been to order an ultrasound, but from his review of Dr. Heacock's progress notes he saw no symptoms that would be concerning for a DVT, so an ultrasound was not indicated. To the extent Smiley had complaints of leg and knee pain, Dr. Zeno also explained that the MRI showed a Baker's cyst, which in his view is basically synonymous with a popliteal cyst, and when one of these cysts ruptures, he said, it can cause significant discomfort, swelling, and tenderness. In Dr. Zeno's opinion, Dr. Heacock complied at all times with the standard of care, and she did the definitive workup for the patient's symptoms.

{¶49} Dr. Zeno was asked on cross-examination about nursing flowsheets showing that nurses temporarily noted some increase in leg swelling during the first hospitalization, but he testified that it cannot be discerned from the flowsheets whether the swelling was in the calf. To have suspicion for a DVT, Dr. Zeno stated, there needed to be symptomology in the calf area. Dr. Zeno testified that insofar as there was swelling in the right leg more generally or elsewhere than the calf, the rheumatology and orthopedic consultants felt that Smiley's symptoms were consistent with ankylosing spondylitis. Dr. Zeno also gave some testimony about the Wells Criteria, although he stated that it has come under some scrutiny for its lack of effectiveness when applied to hospitalized patients and he stated that the score for Smiley would have fallen into the category of a DVT being unlikely. Dr. Zeno also testified that the Wells Criteria is applied only when there is a concern that the patient has a DVT, but in this case there clearly was a more likely alternative diagnosis for Smiley's symptoms.

{¶50} Regarding Smiley's discharge from the hospital, Dr. Zeno acknowledged that he rarely is responsible for discharging patients but that in general a discharging physician should make sure the patient is stable, that the patient's symptoms have been addressed, and that there is an appropriate follow-up plan. From Dr. Zeno's review of the discharge summary prepared by Dr. Mathew, he does not feel there is anything that should have raised concern for a DVT or prompted Dr. Mathew to order an ultrasound; indeed, Dr. Zeno opined that Smiley did not have a DVT during this hospitalization. In Dr. Zeno's opinion, Dr. Mathew complied with the standard of care. While Dr. Zeno understands that the coroner attributed Smiley's death to an embolism caused by a DVT, his opinion is that the DVT was not present during the first hospitalization.

{¶51} Allan Gibofsky, M.D., J.D., an expert witness for defendant, testified that he is board-certified in internal medicine and rheumatology and spends 80 to 90 percent of his professional time as a clinician, while also serving as a professor in both the Department of Medicine and the Department of Healthcare Policy & Research at Cornell University Medical College in New York. Dr. Gibofsky explained that he practices at New York Presbyterian Hospital/Weill Cornell Medicine and the Hospital for Special Surgery, and that he is also a consultant to Memorial Sloan Kettering Cancer Center. Dr. Gibofsky, who received his medical degree in 1973, went over his educational and training background and his professional history, which includes service as President of the American College of Rheumatology, as a reviewer for medical journals including The Lancet and New England Journal of Medicine, and as chair of the Arthritis Advisory Committee of the U.S. Food & Drug Administration. While he is a rheumatologist, Dr. Gibofsky stated, he also practices principal care at times, such that if his rheumatology patients develop internal medicine problems he may manage those as well.

{¶52} Dr. Gibofsky testified that ankylosing spondylitis is not a frequent condition among rheumatic diseases, but that he regularly sees patients for it and has been doing

so for over 40 years. Ankylosing spondylitis is an inflammatory condition of unknown etiology that affects primarily the spine but can affect other joints in the body, including the sacroiliac and hip joints. Although it is not often that he diagnoses a DVT, Dr. Gibofsky stated, it is something that is regularly on his differential diagnosis depending on what he is called in to evaluate, such as where there are complaints of leg pain or leg swelling. Signs of DVT include a change in circumference of any portion of the leg, i.e. swelling that is not explained by other etiologies, as well as weakening of pulses, tenderness to palpation, and swelling of the lower extremity, Dr. Gibofsky testified. Dr. Gibofsky described a differential diagnosis as a list of things that may be causing something to occur, and there is an index of clinical suspicion for the things on the list relative to the probability that one or more of them is occurring; as time goes on, the list may be narrowed down as things are ruled out. According to Dr. Gibofsky, if he were concerned about a potential DVT in a lower extremity, he would measure the circumference of each leg (particularly the calves, and probably thighs), check pulses for weakening or obliteration, and, depending on the degree of suspicion he might order an ultrasound or other imaging study, but he would also assess any other conditions that could be affecting the inflammatory response.

{¶53} Dr. Gibofsky acknowledged that swelling and tenderness to palpation, which were referenced in the Emergency Assessment form that accompanied Smiley from the prison to the emergency department, can be consistent with a DVT, but he testified that the complaints identified in that form are consistent with Smiley's ankylosing spondylitis. Looking at Smiley's history as related to Dr. Matcheswalla at the time of admission to the hospital, Dr. Gibofsky testified that Smiley chiefly complained of low back pain and right leg pain, and he explained how this is a typical complaint from patients with ankylosing spondylitis due to inflammation in the spine and joints. Smiley had a 10-year history of ankylosing spondylitis, Dr. Gibofsky noted, and from the documented history that he reviewed it appeared to him that Smiley had a moderate

form of the condition that was managed with the anti-inflammatory methotrexate, but there were intermittent flares. Dr. Gibofsky also discussed how ankylosing spondylitis patients may have inflammation around the eyes at times, and how such manifestations of the disease occurring outside of joint areas do not necessarily happen in conjunction with manifestations in the joints, so that even though Smiley reported having no eye symptoms at the hospital despite normally having them during flares of the disease, this does not mean Smiley was not having a flare.

{¶54} Dr. Gibofsky's testimony largely pertained to the consultations with the rheumatology team, beginning with the initial one on January 30, 2015; as Dr. Gibofsky explained, the right knee enthesitis observed then is a clinical feature of ankylosing spondylitis. (Defendant's Exhibit B, p. 23.) Dr. Gibofsky explained that Dr. Meara's musculoskeletal findings, including the cool, large effusion of the right knee, are consistent with ankylosing spondylitis and not concerning for DVT. Also regarding the knee, Dr. Gibofsky explained how the elevated white blood cell and markedly elevated ESR and CRP levels in the lab reports demonstrate an inflammatory process consistent with ankylosing spondylitis. Dr. Gibofsky explained how Dr. Meara's plan of treatment included injecting the knee with Depo-Medrol and recommending that Smiley be started on both a non-steroidal anti-inflammatory and a topical gel, and she recommended that he continue taking methotrexate. Dr. Gibofsky also described Dr. Meara's plan for Smiley's chest pain.

{¶55} Looking at Dr. Meara's February 2, 2015 consultation, Dr. Gibofsky explained how her findings relative to the persistent right knee effusion as well as tenderness, along with tender bilateral metacarpophalangeal joints (hands), positive metatarsal squeeze (feet), and tender paraspinal muscle are all consistent with ankylosing spondylitis and not concerning for DVT. (Defendant's Exhibit B, p. 24.) After Smiley underwent a right knee MRI as recommended by Dr. Meara, Dr. Gibofsky explained, she followed up with a note on February 4, 2015, reviewing the MRI.

(Defendant's Exhibit B, p. 31.)   As Dr. Gibofsky explained, among other things the MRI showed a large joint effusion in the knee with mild synoptics (inflammation of joint tissue), a popliteal synovial cyst with partial disruption with edema in the popliteus muscle, and a Baker's cyst with partial disruption.   Baker's cysts and popliteal cysts refer to localized accumulation of fluid behind the knee, Dr. Gibofsky stated.   Dr. Gibofsky explained that when the cyst is disrupted it causes fluid to drain down the leg—or up the leg, if the leg is elevated—and that a ruptured Baker's cyst can sometimes mimic the findings of a DVT of the calf, particularly swelling and tenderness.

{¶56} Dr. Gibofsky testified that if a patient with a ruptured Baker's cyst also had a change in leg circumference and obliterated pulses, there would be more concern for a DVT.   Dr. Gibofsky stated that in this case he understands there was no documented change in circumference in leg swelling and calf swelling was not commented on specifically as a unilateral change.   Having intact pulses throughout the extremity significantly lowers the likelihood of DVT, according to Dr. Gibofsky, because in many presentations the DVT would weaken or obliterate the pulse below or possibly above the area of obstruction, and while this alone would not rule out a DVT, it would make the presence of a DVT very low in clinical suspicion.   Dr. Gibofsky stated that the physician ultimately must rely on clinical suspicion specific to the patient.   Suspicion goes down with a patient receiving prophylaxis like Smiley, Dr. Gibofsky added.   Dr. Gibofsky stated that even when there are changes in the calf in a patient with a ruptured Baker's cyst but he is convinced the changes stem from fluid draining out of the cyst rather than a DVT, an ultrasound would not necessarily be required.   Dr. Gibofsky was asked on cross-examination about ordering a D-dimer study in relation to concern for a DVT, but he explained that it is not a particularly useful test for ruling out a DVT in patients with inflammatory diseases.

{¶57} In Dr. Gibofsky's opinion, given Smiley's flare of ankylosing spondylitis and knee effusion, there would not have been a high index of suspicion for a DVT and there

would not need to be a workup to rule out a DVT; indeed, his opinion is that Smiley did not have a DVT during the first hospitalization. Dr. Gibofsky opined that there was no breach of the standard of care by Dr. Meara. In short, he opined, Dr. Meara was consulted to evaluate an acute flare of Smiley's ankylosing spondylitis, she appropriately addressed the acute manifestations of that chronic disease—primarily the right knee effusion that recurred after having been drained and was undoubtedly related to the ankylosing spondylitis, and she appropriately monitored the extremities for other potential etiologies of the symptoms, but determined that the cause was an active disease of the knee. Looking at the notes from Dr. Meara's encounters with Smiley, there was nothing that would be concerning for a DVT, Dr. Gibofsky stated.

**LAW**

**{¶58}** Plaintiff's claims are based upon a theory of medical malpractice. "In order to establish medical malpractice, a plaintiff must show: (1) the standard of care recognized by the medical community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained." *Tobin v. Univ. Hosp. E.*, 10th Dist. Franklin No. 15AP-153, 2015-Ohio-3903, ¶ 14, citing *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 12AP-999, 2013-Ohio-5140, ¶ 19. "Expert testimony is required to establish the standard of care and to demonstrate the defendant's alleged failure to conform to that standard." *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, 950 N.E.2d 605, ¶ 38 (10th Dist.), citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130-131, 346 N.E.2d 673 (1976). The Supreme Court of Ohio established the legal standard for medical malpractice in *Bruni*:

**{¶59}** "In evaluating the conduct of a physician and surgeon charged with malpractice, the test is whether the physician, in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care and diligence would not have done under the same or

similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances. He is required to exercise the average degree of skill, care and diligence exercised by members of the same medical specialty community in similar situations." *Id.* at 129-130.

## ANALYSIS

{¶60} Upon review of the evidence presented at trial, the magistrate finds as follows. Among other medical conditions that he had, Smiley was diagnosed in 2003 with ankylosing spondylitis, and, as is typical with the disease, he experienced exacerbations or flares from time to time. In early January 2015, Smiley experienced progressively worsening low back and right leg pain for which he sought treatment in the infirmary at Richland Correctional Institution, where he was incarcerated. Near the end of the month, medical personnel kept Smiley in the infirmary for observation and documented his complaints of low back and right leg pain. The right leg pain, as reported by Smiley, was primarily in the hip and thigh. Smiley also reported on January 27, 2015, that there had been some intermittent pain radiating down to the calf, although when he told this to the nurse the pain was confined to the hip and thigh, which he rated at a 5. (Plaintiff's Exhibit 1, pp. 39, 155.) On January 29, 2015, Smiley reported that his pain, which was described as radiating from the low back down through the right hip and thigh, had increased to an 8 and that after stretching the right leg out sometime the night before, his calf had felt tight. Nurse Practitioner Ungar decided to have Smiley transported to defendant's emergency department for evaluation. In connection with the transport, Ungar described Smiley's history and complaints and her findings in an Emergency Assessment form that would be the only medical record to accompany him. Although Unger previously documented having some suspicion of a DVT, she did not note this on the Emergency Assessment form,

and while she described issues with the right leg in general, she did not describe anything specific to the calf.

{¶61} Smiley arrived at the emergency department on the evening of January 29, 2015, and was seen by four different doctors, none of whom documented any suspicion for a DVT, and there were no criticisms of them in this case. Smiley complained of progressively worsening low back, hip, and right leg pain over the past month, and specifically noted pain in the right quadriceps. (Defendant's Exhibit A.) Smiley was found to have tenderness to palpation of the lumbar spine, sacroiliac joints, and right hip and thigh, as well as an effusion of the right knee, but he had no tenderness nor swelling of the calf. (Id., p. 5.) X-rays of the spine and knee were taken, the knee effusion was drained, and an orthopedic consultation was ordered.

{¶62} Dr. Marissa Jamieson, whose care has not been criticized in this case, performed the orthopedic consultation early on the morning of January 30, 2015, noting that Smiley reported progressively worsening right thigh and back pain, with some pain also in the groin and buttock. (Defendant's Exhibit B, p. 17.) Upon examining Smiley, Dr. Jamieson found tenderness to palpation around the sacroiliac joint, buttock, and anterior thigh, mild swelling around the knee, and no erythema. (Id., p. 19.) In her assessment and plan, Dr. Jamieson found no concern for a septic hip and she made some recommendations, including administering prednisone, considering a rheumatology evaluation, and physical therapy. (Id., p. 20.)

{¶63} Soon after Dr. Jamieson's consultation, Dr. Matcheswalla reviewed the available records, examined Smiley, and admitted him to the hospital. In the History and Physical report that he prepared, Dr. Matcheswalla documented Smiley having pain in the back and right buttocks and leg, with no mention of the calf, and he noted that Smiley had no erythema. (Defendant's Exhibit B, p. 13.) Pursuant to hospital policy applicable to all admitted patients, Dr. Matcheswalla ordered heparin as a DVT prophylaxis, which the experts agree was appropriate. Dr. Matcheswalla acknowledged

that the records he saw before examining Smiley showed symptoms that were not inconsistent with a DVT, and in his mind a DVT would initially have been within his differential diagnosis, but upon examining Smiley he suspected the symptoms were explained by an exacerbation of ankylosing spondylitis and he was not concerned about a DVT, making no mention of it in the History and Physical report.

{¶64} Because he suspected Smiley's symptoms were associated with ankylosing spondylitis, Dr. Matcheswalla among other things ordered a rheumatology evaluation, just as Dr. Jamieson had recommended, as well as an MRI of the lumbar spine, and prednisone for the pain. Smiley's symptoms were indeed consistent with an exacerbation of ankylosing spondylitis, and there is no question that he was having an exacerbation of ankylosing spondylitis during his time at the hospital. Smiley had pain in the low back and into the hips, thigh, and buttock, and joint pain in the knee, all common symptoms of the disease, and he had elevated inflammatory markers in his lab work consistent with the disease. By comparison, whereas erythema, pain, and swelling in the calf are common symptoms of a DVT, Smiley never had erythema during his hospitalization, and while he had been noted to have some pain and swelling in the leg, particularly the upper leg and knee, Dr. Goldstein admitted that swelling from a DVT is usually in the calf, and nowhere in the medical records available to Dr. Matcheswalla were any calf symptoms mentioned—to the contrary, Smiley was specifically found to have "[n]o tenderness of the right calf, no swelling" in the emergency department. (Defendant's Exhibit A, p. 5.) Although Dr. Goldstein opined that Smiley had a DVT when Dr. Matcheswalla admitted him to the hospital, that opinion was based in part upon a Progress Note from Richland Correctional Institution that was not available to Dr. Matcheswalla, about how Smiley had stretched his right leg and then felt tightness in the calf; no such symptoms occurred at the hospital. Regardless, Drs. Gibofsky and Zeno opined that Smiley did not have a DVT when he was admitted to the hospital and the magistrate is not persuaded by Dr. Goldstein's opinion to the contrary.

{¶65} Midday on January 30, 2015, after being admitted to the hospital, Smiley underwent a rheumatology consultation with Dr. Meara, along with Dr. Peter Embi. Smiley reported that for more than a month he had "pain in his back and particularly his knee," and that he had just begun to develop chest pain. (Defendant's Exhibit B, p. 21.) Dr. Meara's musculoskeletal findings upon examining Smiley, especially regarding his knee effusion and enthesitis, were consistent with ankylosing spondylitis and not concerning for a DVT. This, on top of the earlier lab work showing elevated inflammatory markers, was further evidence of Smiley having an exacerbation of ankylosing spondylitis and Dr. Meara concluded that the disease explained Smiley's symptoms. Dr. Meara gave a steroid injection in the right knee and wrote out a treatment plan for Smiley's symptoms overall, including a recommendation that Smiley undergo an MRI of the right knee if the pain there did not improve within 48 hours.

{¶66} In the afternoon of January 30, 2015, Smiley was seen by his attending physician, Dr. Heacock, after complaining of chest pain, palpitations, and dizziness. Dr. Heacock wrote out her impression and plan, focusing on four conditions that Smiley undisputedly had at the time: sinus tachycardia, pleuritic chest pain, right knee enthesitis, and ankylosing spondylitis. Whereas Smiley had already been seen by a rheumatologist for the latter two issues, his chest symptoms had developed recently and were more acute, and Dr. Heacock appropriately wanted to rule out acute coronary syndrome, a pulmonary embolism, or pleuritis, so she ordered testing to accomplish that. Dr. Heacock also adjusted Smiley's medication since he felt the new symptoms were a reaction to prednisone. Dr. Heacock followed up with Smiley two hours later.

{¶67} The following day, January 31, 2015, Dr. Heacock followed up again, and by that time testing showed that acute coronary syndrome was unlikely, but the test she had ordered to rule out a pulmonary embolism—checking Smiley's D-dimer level—produced an elevated result that failed to rule the condition out. Dr. Heacock then ordered a CT scan which definitively ruled out a pulmonary embolism. While plaintiff

argues that the elevated D-dimer level was consistent with a DVT and should have prompted Dr. Heacock to order an ultrasound to rule out a DVT, there are several reasons why a physician may check the D-dimer level and in this instance she did not do so to rule out a DVT. She appropriately ordered it to rule out a pulmonary embolism, and when it failed to do so, she took the appropriate next step for ruling out that condition. There was no disagreement in the medical testimony that inflammatory processes cause D-dimer levels to be elevated, so in the context of a patient with an active inflammatory process like Smiley had with his ankylosing spondylitis, an elevated D-dimer was to be expected and would only prompt further testing for the condition that Dr. Heacock was trying to rule out: a pulmonary embolism. Consistent with the elevated ESR and CRP levels previously measured, the elevated D-dimer level further demonstrated the active flare of ankylosing spondylitis that Smiley was experiencing.

{¶68} On February 1, 2015, Dr. Heacock noted that the pleuritic chest pain had lessened but that there had been "worsening right leg pain and swelling" and Smiley was having palpitations and tachycardia. (Defendant's Exhibit B, p. 40.) Nursing notes too reflect some increased right leg swelling at that time, although it was still "mild." (Plaintiff's Exhibit 2, p. 204.) These symptoms coincided with the return of the knee effusion that had been drained when Smiley came to the hospital, and indeed the knee was still where the swelling was primarily seen. As the knee problems persisted, Smiley was seen for a follow-up rheumatology consultation by Dr. Meara, along with Dr. Zhanna Mikulik, on February 2, 2015. Dr. Meara made several recommendations, including an MRI of the knee inasmuch as she thought the pain was out of proportion to what she saw upon examination and wanted to rule out a fracture or avascular necrosis. (Defendant's Exhibit B, p. 24-26.) Smiley was also seen for a follow-up orthopedic consultation on February 2, 2015, with Dr. Corey Beals, who noted, among other things, the knee effusion and tenderness to palpation and pain in and around the knee, but that no acute orthopedic intervention was indicated. (Defendant's Exhibit B, p. 41.)

{¶69} Because significant anxiety symptoms manifested each afternoon, apparently in connection with the chest pain and sinus tachycardia, Dr. Heacock also arranged a psychiatry consultation.  (Defendant's Exhibit B, p. 49.)   Smiley, who reported a history of psychiatric hospitalization and a suicide attempt, was seen by Dr. Kevin Johns for the psychiatry consultation on February 3, 2015, after Smiley "had an episode of agitation where he complained of chest pain, shortness of breath, and he was biting his arm."  (Defendant's Exhibit B, p. 27.)   Dr. Johnson recommended antipsychotic medication, as well as tapering off steroidal medications since Smiley indicated that his behaviors were consistent with past reactions to steroids.   Dr. Heacock also ordered physical therapy for Smiley and he was seen for a session on February 3, 2015, at which time it was noted he had pain in his back, right knee, and left foot, and that he had swelling in his right knee.  (Defendant's Exhibit B, pp. 42-46.)

{¶70} As ordered by Dr. Heacock, and consistent with the recommendation by Dr. Meara, Smiley underwent an MRI of the right knee on February 3, 2015.  The MRI showed a large effusion as well as a ruptured Baker's cyst and partially-ruptured popliteal cyst, which can cause pain and swelling, consistent with the pain and swelling Smiley experienced in the knee.  Dr. Meara followed up with a progress note again on February 4, 2015, after having seen the MRI report, and made recommendations for treatment of the ankylosing spondylitis on an outpatient basis and for draining one or both cysts.  (Defendant's Exhibit B, p. 31.)   With the MRI results not only being consistent with the diagnosis of a knee effusion associated with ankylosing spondylitis, but also further explaining the knee symptoms, Dr. Meara felt that Smiley was ready to be discharged from a rheumatology standpoint.   And, nursing notes show that the previously noted "mild" swelling in the right leg had lessened to only a "trace," and the location where Smiley reported pain was his knee—again, a symptom that was explained by the diagnoses of the knee effusion and ruptured cyst.  (Plaintiff's Exhibit 2, pp. 261, 266.)

{¶71} Dr. Heacock, before ending her shift on February 4, 2015, wrote an email to the hospitalists who would be assuming responsibility for her patients, including Dr. Mathew, summarizing her evaluation of Smiley and other patients whom she felt would be ready to be discharged while the new hospitalists were on duty. In her message, Dr. Heacock detailed how she felt ankylosing spondylitis was likely causing the right knee effusion, which, through testing, had been shown to have no sign of infection and thus was consistent with ankylosing spondylitis, and how the MRI revealed the cysts which further explained Smiley's knee issues. As far as the chest pain was concerned, Dr. Heacock detailed how she ruled out a pulmonary embolism and how it seemed to be related to the anxiety attacks which were likely resulting from steroidal medications. Dr. Heacock's plan was to wait and see how Smiley responded to changes in his medications, and if he did well he would be discharged to the care of the Department of Rehabilitation and Correction and receive follow up attention for orthopedics, rheumatology, and physical therapy. When Dr. Mathew came to see Smiley, he observed that Smiley's pain had decreased and he was more comfortable overall than he had been reported to be in previous exams. Dr. Mathew reviewed Smiley's chart, contacted the orthopedic and rheumatology teams once more, and made the decision to discharge Smiley. While plaintiff argues that Dr. Mathew deferred to Dr. Heacock's evaluations and plans, Dr. Mathew acknowledged that on some level he did so, but it is also apparent that he gave due attention to the patient and, moreover, that Dr. Heacock provided him with a detailed and reasoned summary of her assessments for the patient.

{¶72} Smiley was transported on February 4, 2015, to Franklin Medical Center, under the care of the Department of Rehabilitation and Correction. (Although plaintiff originally named the Department of Rehabilitation and Correction as a defendant in this matter, she later voluntarily dismissed the claims against it.) At Franklin Medical Center, there were no documented concerns for a DVT and Smiley's symptoms

remained largely the same until February 9, 2015, when he reported chest and back pain. The following morning, Smiley was found unresponsive and was transported back to the hospital, where he was found to have had a pulmonary embolism and his prognosis was extremely poor, and on February 19, 2015, he passed away. No criticisms were raised about the care rendered during the second hospitalization.

{¶73} Although Dr. Goldstein criticized each of the hospitalists who cared for Smiley during his first hospitalization, the magistrate finds that at all times relevant the diagnosis, care and treatment rendered by defendant's medical professionals met the standard of care. From the time Smiley arrived at the emergency department on January 29, 2015, to when he was discharged on February 4, 2015, he was seen by several doctors, including emergency department doctors, hospitalists, and consultants, and not one of them noted any suspicion that he might have a DVT. Dr. Matcheswalla, who of the three hospitalists had the least information available to him, indicated he would have initially given it some thought as a differential diagnosis based on the information he had from the prison's Emergency Assessment form and the emergency department records—and as was required for all patients admitted to the hospital he ordered the administration of heparin as a preventive measure against a DVT—but even from the time Dr. Matcheswalla examined Smiley it was apparent that a DVT was not suspected and no diagnostic testing was required.

{¶74} It was established by that time that Smiley had symptoms of ankylosing spondylitis and that the disease was probably manifesting in several ways that were not consistent with a DVT, including tenderness to palpation of the lumbar spine and sacroiliac joints, tenderness to palpation of the right lateral hip, and the right knee effusion. And, it had already been determined in the emergency department that he did not have calf swelling or tenderness. So, from the beginning Smiley's clinical picture seemed to be reasonably explained by ankylosing spondylitis. He had classic symptoms of that disease but did not have classic symptoms of a DVT. Dr. Jamieson,

who saw Smiley for the orthopedic consultation before his admission to the hospital, made findings similar to what the emergency department physicians and Dr. Matcheswalla saw, and she also found Smiley's pulses to be intact, which as Dr. Gibofsky explained is a contraindication for DVT. Bloodwork had been performed as well by the time Dr. Matcheswalla saw Smiley and the elevated inflammatory markers lent further support to the suspicion of ankylosing spondylitis.

{¶75} The lack of suspicion for a DVT from the time Smiley arrived at the hospital and onward is consistent with the fact that the classic symptoms of a DVT—calf swelling, pain, and erythema—were never documented to be present at any time in the emergency department or during the hospitalization. While the medical chart and the prison's Emergency Assessment form contain references to swelling or pain in the right leg in general, whenever any of the medical professionals noted specific places in the leg where Smiley had such symptoms, it was in places other than the calf, for instance the knee or upper leg, which were consistent with the ankylosing spondylitis flare and knee effusion. The medical records are replete with references to specific locations where Smiley had pain, swelling, or tenderness, such as his lower back, sacroiliac joint, hip, buttocks, groin, thigh, quadriceps, upper leg, or knee, but never the calf. And, by February 4, 2015, there was apparently some improvement in his symptoms. There is also no evidence whatsoever of Smiley having erythema.

{¶76} While Dr. Goldstein emphasized unilateral leg swelling and pain, whether or not in the calf specifically, as a sign of DVT that should have prompted testing to rule it out at any time during the hospital stay, there were more reasonable explanations for Smiley's symptoms from the time he arrived and they were confirmed through testing. In assessing Smiley's differential diagnoses, the hospitalists relied not only on their clinical judgment, but upon the specialized knowledge of experts in multiple disciplines. It was suspected from the time of admission that Smiley was having a flare of ankylosing spondylitis, and indeed subsequent consultations with the rheumatology

team confirmed that to be the case.    Dr. Gibofsky, a national leader in the field of rheumatology who has significant experience treating patients with ankylosing spondylitis, gave a persuasive explanation of how Smiley's pain, which was not limited to the right leg, was a typical symptom of ankylosing spondylitis, as was the related knee effusion (where the most leg swelling was noted to be), and how these explanations would render any concern for a DVT quite low.    Smiley was referred to Dr. Meara, the rheumatology consultant, essentially to determine whether his symptoms were being caused by ankylosing spondylitis.    After examining Smiley, Dr. Meara confirmed that to be the case and went on to provide additional support to that explanation through her subsequent involvement in Smiley's care.    That determination by Dr. Meara was correct and no one challenges it today.    While the diagnosis of an ankylosing spondylitis flare would not rule out the presence of a DVT, Dr. Gibofsky gave convincing testimony about why there would have been little concern for a DVT, such as Smiley having intact pulses.

{¶77} Although plaintiff's expert criticized all three hospitalists in this case, in her post-trial brief plaintiff is most critical of Dr. Heacock, citing issues with her charting and her testimony, such as her testimony that the Emergency Assessment form from the prison was not available to her.  Plaintiff points out that this testimony is at odds with the balance of the evidence, but, whether or not Dr. Heacock saw the Emergency Assessment form, she was familiar with the symptoms that it related and reading it would not have caused a physician of ordinary skill, care and diligence to have rendered care differently than what she did.    Plaintiff misstates Dr. Heacock's testimony in her post-trial brief, asserting that "Dr. Heacock admitted that had she been aware of the complaints within the DRC Form, it would have triggered a clinical suspicion for DVT," but what Dr. Heacock said was that clinical suspicion would be triggered by knowing of an immediate history of pain or swelling in the calf, which is not what the form stated. (Plaintiff's Brief, p. 24, citing Trial Transcript, p. 544.)    Whatever issues there may have

been with Dr. Heacock's testimony, the medical records demonstrate the care and treatment that she provided, from identifying differential diagnoses based on the various symptoms presented by Smiley, to ordering testing and ultimately getting confirmation as to what was causing his symptoms, and the evidence shows that she, as well as the other hospitalists who cared for him, complied with the standard of care.

{¶78} Plaintiff also points to testimony about the Wells Criteria and a set of guidelines from the American College of Chest Physicians as supporting her argument that diagnostic testing for a DVT was required. The magistrate gives little weight to that evidence, however. The Wells Criteria is applied when a physician has reason to suspect a DVT, which the greater weight of the evidence shows was not the case here. Dr. Goldstein also had varying interpretations of what Smiley's score under the Wells Criteria would have been, scoring it as low as a one, which translates to a DVT being unlikely. Dr. Zeno too scored Smiley as unlikely for a DVT and he cast some doubt on the efficacy of the Wells Criteria in a hospitalized patient such as Smiley. The guidelines from the American College of Chest Physicians were not admitted into evidence and Dr. Goldstein, who is not a member of that organization, could not recall whether he found the guidelines or if they were supplied to him by counsel. Regardless, both Dr. Goldstein and Dr. Zeno, who is a member of the organization, testified that the section of the guidelines in question only applies when a DVT is suspected.

{¶79} Finally, regarding the causation element of plaintiff's medical negligence claim, the magistrate finds it was not proven by a preponderance of the evidence that, even if an ultrasound of the lower right leg had been ordered at any time during the first hospitalization, a DVT would have been detected. Dr. Goldstein, the only physician who held that opinion, was a bit conclusory on this element of the case and there was little supporting testimony explaining it in terms of DVT pathology or otherwise. Dr. Goldstein cited the progress note from the prison (which did not accompany Smiley to the hospital) about Smiley feeling tightness in his calf after stretching his leg, but it

was specifically documented that he had no calf swelling or tenderness in the emergency department, nor were calf symptoms ever documented during his hospitalization. Moreover, Drs. Gibofsky and Zeno opined that Smiley probably did not have a DVT during the first hospitalization.

**CONCLUSION**

{¶80} The magistrate sympathizes with plaintiff, Smiley's children, and others affected by his passing; touching recollections about him were shared at trial and the anguish over losing him is evident. In the final analysis, though, the magistrate finds that the claims against defendant were not proven by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶81} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

**Filed June 24, 2019**
**Sent to S.C. Reporter 7/22/19**